UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In Re:

RICHARD J. BAKER and                                   Chapter 7
AMANDA L. BAKER,                                       Case No.: 08-62748

                                    Debtors.
_____

In Re:

JAMES C. COLLINS, ESQ., CHAPTER 7 TRUSTEE,             Adv. Pro. No.: 10-80055

                                      Plaintiff,

vs.

JEANNE ANGELL,

                                      Defendant.
_____

APPEARANCES:

THE CROSSMORE LAW OFFICE                               *Edward Y. Crossmore, Esq.*
*Attorneys for Plaintiff*
115 West Green Street
Ithaca, New York 14850

JAMES G. CUSHMAN, ESQ.
*Attorney for Defendant*
The Eaton Center
15 Eaton Avenue
Norwich, New York 13815

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

      By Memorandum-Decision and Order filed June 26, 2013, United States District Court Judge Lawrence E. Kahn vacated and remanded this Court's Memorandum-Decision and Order issued February 29, 2012, in which this Court awarded summary judgment to Defendant Jeanne Angell ("Angell") on the preferential transfer and turnover claims of Plaintiff James C. Collins,

Esq., Chapter 7 Trustee (the "Trustee").  *Collins v. Angell (In re Baker)*, 465 B.R. 359 (Bankr. N.D.N.Y. 2012), *vacated*, *Collins v. Angell*, 2013 U.S. Dist. LEXIS 89524 (N.D.N.Y. June 26, 2013).

This Court held that Angell had a perfected security interest in sixteen dairy cows prior to the ninety-day preference period set forth in 11 U.S.C. § 547(b)(4)(A) and that she was therefore entitled to the pre-petition auction proceeds from the sale of those cows by Debtors Richard and Amanda Baker ("Debtors").[1]  Specifically, this Court found that the identical description contained in Angell's 2008 Security Agreement with Debtors (the "2008 Security Agreement") (Pl.s Ex. 4) and in her filed 2008 UCC-1 Financing Statement (the "2008 UCC-1") (Pl.'s Ex. 1 at Ex. C), which included a barn name and ear tag identification number for each cow, was sufficient to provide notice to third parties that Angell may have a security interest in the sixteen dairy cows.  Moreover, this Court found that Angell's security interest could definitively be ascertained notwithstanding missing ear tags on ten of the cows and nonmatching ear tag numbers on six of the cows upon further inquiry of any interested third party and upon their inspection of the registration certificate for each cow issued by Holstein Association USA, Inc. (the "Holstein Association").  *Collins*, 2013 U.S. Dist. LEXIS 89524, at *6.  The District Court determined that this Court "found industry customs relevant to the sufficiency of notice" provided by the 2008 Security Agreement and 2008 UCC-1.  *Id.* at *6.  Although the District Court agreed with this Court's analysis under the New York Uniform Commercial Code ("NY UCC"), it held that this Court did not have an adequate record to support a factual determination regarding the existence and scope of an industry custom of identifying dairy cattle using

---

[1] Unless otherwise indicated, all statutory references are to Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (2012) (the "Bankruptcy Code").

registration certificates.[2]  *Id.* at *9.  Accordingly, the District Court remanded the proceeding back to this Court for additional factfinding.

Pursuant to the District Court's limited remand, the narrow question presently before this Court is whether Angell sufficiently proved the relevant industry custom in question at a trial held before the undersigned on November 20, 2013.  After evidence was presented and in lieu of closing arguments, the Court requested that the parties file supplemental memoranda of law.  Angell and the Trustee complied by filing their respective post-trial memorandum of law on January 17, 2014 (ECF Adv. Pro. Nos. 76 & 77), and the matter was taken under submission.  Now, having considered the District Court's remand, the parties' supplemental memoranda of law and incorporated arguments of counsel, the evidence presented, and the applicable law, this Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, which is made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and (b)(2)(E), (F), and (K).

---

[2] Both this Court and the District Court rejected the Trustee's argument that the 2008 UCC-1 was "seriously misleading" and therefore ineffective under state law.  *See* N.Y. U.C.C. 9-506(a) (Consol. 2014); *Collins*, 2013 U.S. Dist. LEXIS 89524, at *7.  The proper inquiry is whether the 2008 UCC-1 contains a sufficient description to permit the reasonable identification of the collateral.  The answer to this binary question is not as straightforward as this Court would like.  As this Court reads the District Court remand, under the broad notice-filing philosophy that underlies Article 9, Angell's inclusion of names on the 2008 UCC-1 may provide a key to the collateral's identity and the description may therefore be sufficient to lead a person of ordinary business prudence to inquire further about and discern the exact collateral described in the 2008 UCC-1.  Whether the 2008 UCC-1 is in fact sufficient to defeat a third party's claim to the same collateral, however, turns on what knowledge a reasonable searcher would be charged with knowing or acquiring through the standard due diligence process for that particular type of transaction.  Accordingly, this Court must take into account industry custom.  *See, e.g., In re Fogarty*, 114 B.R. 788, 792 (Bankr. S.D. Fl. 1990) (The Bankruptcy Court recognized that it must take into account the commercial realities of the parties' secured transaction within the context of the thoroughbred horse industry.  Having observed that it is widely acknowledged in the thoroughbred horse industry that the intrinsic value of a thoroughbred mare is based in large part on the mare's ability to produce foals, the Bankruptcy Court held that a financing statement that contained only a description of the mares was sufficient to alert third parties of the bank's interest in the foals thereby perfecting the bank's security interest in the foals.).

# FACTS[3]

### A. Established Findings of Fact

1. Angell sold Debtors fifty-eight cows in 2006. The parties did not, however, complete, deliver, and execute the related documentation for the transaction, including a Bill of Sale and Security Agreement, until August 10, 2008. On that date, Angell delivered a Bill of Sale to Debtors and, in exchange, Debtors contemporaneously executed and delivered to Angell the 2008 Security Agreement granting her a security interest in fifty-eight cows, each identified by a barn name and ear tag designation. On August 13, 2009, Angell filed the 2008 UCC-1 containing the same collateral description as that found in the 2008 Security Agreement. *Collins*, 2013 U.S. Dist. LEXIS 89524, at *1–2.

2. When Angell sold the cows to Debtors in 2006, she delivered a registration certificate issued by the Holstein Association for each cow, which included a sketch of each cow. Neither the 2008 Security Agreement nor the 2008 UCC-1 referenced the registration certificates. *Id.* at *2.

3. On or about September 18, 2008, Debtors engaged Burton Livestock Auction ("Burton Livestock"), an auctioneer associated with Empire Livestock, to auction eighty cows belonging to Debtors' herd. *Id.* at *3.

4. Immediately following the auction, Burton Livestock issued Angell a check in the amount of $27,764.20 for the net proceeds for twenty-two cows that the auctioneer identified as Angell's by utilizing the registration certificates. *Id.*

5. On November 12, 2008, Debtors filed a voluntary petition for chapter 7 relief.

---

[3] The Court assumes the parties' familiarity with the existing record and procedural background and recites only those background and additional facts necessary to its post-remand analysis.

6. The Trustee's suit against Angell to recover the auction proceeds soon followed with his filing of a summons and adversary complaint on November 20, 2010.

**B.  Post-Trial Findings of Fact**

7. The Court heard testimony from the following witnesses at trial: (1) Angell, who identified herself as a dairy farmer and purchaser and seller of registered Holstein cows with more than thirty-five years of experience in the dairy industry (Trial Tr. 10, Nov. 20, 2013, ECF Adv. No. 74); (2) David Gary Sherwood ("Sherwood"), who identified himself as a life-long dairy farmer and ten-year employee and operations manager of Empire Livestock (Trial Tr. 51–52); (3) Robert W. Wilson ("Wilson), who identified himself as a life-long dairy farmer and twenty-three-year employee and field representative of the Holstein Association for part of New York and all of New England (Trial Tr. 92); (4) Melvin Smith ("Smith"), who identified himself as a life-long farmer who owned and operated a dairy farm from 1976 until 2008 (Trial Tr. 109), at which time he transitioned from dairy farming to crop and beef cattle farming (Trial Tr. 108–09); and (5) John S. Fessenden ("Fessenden"), who identified himself as a fifth generation dairy farmer, former board member and President of the Northeast Dairy Producers Association, and eleven-year employee and Senior Loan Officer of Farm Credit East Agricultural Association ("FCE") (Trial Tr. 134–36).  Angell and Sherwood testified on behalf of Angell, while Wilson, Smith, and Fessenden testified on behalf of the Trustee.  All witnesses were highly credible.

8. Angell testified that there is a distinction between registered and non-registered Holstein cattle.  According to Angell, Holstein cows registered with the Holstein Association are more valuable than non-registered Holstein cows because of their pedigree. (Trial Tr. 11.)

9. Wilson described the Holstein Association as a member service breed organization devoted to the genetic identification of dairy cattle in the United States. (Trial Tr. 93.)  The

Holstein Association provides pedigree information for each registered cow, including information concerning the cow's lineage, genetic merit, and milk production records for female relatives that help predict how well the cow may perform in the future. (Trial Tr. 11–12.) Each registered cow is issued a Certificate of Registration listing the cow's registration number, name, color, sex, breeder, owner, sire, dam, and ancestry information. The registration certificate also contains a sketch of the cow, showing its distinctive markings. (Def.'s Ex. 1.)

10. Holstein cows are the predominate dairy cow breed in Central New York. However, only a small percentage of Holstein cows are registered with the Holstein Association. Wilson estimated that 90 percent of cows in his New York region are Holstein cows, and approximately 7-10 percent of those cows are registered with the Holstein Association. (Trial Tr. 93–94.) Fessenden testified that he considers the registered or purebred business to be a subset of the larger dairy Holstein cattle business and, within that subset, approximately 20 percent of all dairy cattle owners have a strong interest in maintaining and tracking the pedigrees and ancestry lines through the registration process. (Trial Tr. 143.) Sherwood testified that only 10-15 percent of the cattle auctioned by his employer are registered. (Trial Tr. 53.) The witnesses' testimony is consistent with and supported by the United States Department of Agriculture's report titled "Dairy 2007: Part I: Reference of Dairy Cattle Health and Management Practices in the United States," which includes data from New York State and reports that only 13.6 percent of all cows for the farming operations studied in seventeen of the United States' major dairy states are registered with a breed association. (Pl.'s Ex. 9 at 17, ¶ 7.)

11. Both Angell and Smith indicated that they did not know of any auctioneers, veterinarians, or farm suppliers who dealt exclusively in the business of registered Holstein cows. (Trial Tr. 46–47 & 121–23.)

12. Sherwood testified that in 2008 the Holstein Association permitted registration of Holstein cattle utilizing either sketches or tamper-proof tags that the Holstein Association provided at a minimal cost to the registrant. (Trial Tr. 66.) Wilson testified that the Holstein Association began providing tamper-proof ear tags to farmers in or around 2000 and that it was common practice by 2006 for farmers to use the same. (Trial Tr. 106.)

13. Wilson testified that in order to determine whether a cow is registered, he would require the registration certificate to be able to identify the animal either by the registration number on the ear tag or by the photo or sketch. (Trial Tr. 102.)

14. According to Sherwood, the auctioneer may use registration certificates to visually identify cattle during the tagging process when they are first brought to the auctioneer's site. (Trial Tr. 52.) With respect to Debtors' herd, Sherwood used only the sketches on the registration certificates that Debtors gave to his employer to identify and prepare several of the sixteen cows for auction. (Trial Tr. 60.) He testified, however, that he used the registration certificates to identify which cows were registered in the absence of ear tags in order to add value for the client rather than to determine lienholder or ownership status. (Trial Tr. 63.)

15. Angell testified that a prospective buyer interested in purchasing only registered Holstein cattle could attend an auction and identify which cows were registered by viewing the information cards that typically hang in the auction barn above each cow, viewing the catalog if one was produced for that particular auction, or viewing the cows' registration certificates kept with the auctioneer's records. (Trial Tr. 116.)

16. For the sixteen cows at issue, Angell stated that a third party who had attended the pre-petition auction of Debtors' herd would have been able to view the registration certificates and to match each cow to its respective registration certificate by virtue of the sketch on the back of the

registration certificate showing the cow's markings, the handwritten vaccination number that she had placed on the front left upper corner of each registration certificate, or the handwritten New York State tag number that she had placed on the front right upper corner of each registration certificate. (Trial Tr. 28–29; Def.'s Ex. 1.) As to the latter two methods, Angell testified on cross-examination that she altered the registration certificates to include vaccination and state identification numbers because it was her farm practice to vaccinate the animals and to record such information on their registration certificates, but that she did not know whether other dairy farmers similarly recorded this information. (Trial Tr. 38.)

17. Smith testified that he bought several registered Holsteins at various auctions during his years of farming and that he never saw the registration certificates until after he purchased the cows. Approximately six weeks after the auction, the Holstein Association would transfer and mail the registration papers to him. (Trial Tr. 116.)

18. Smith stated that he was involved in many dairy cattle purchase and sale transactions over the years and in the course of such transactions he granted the lender or financial institution liens on the cows. He testified that registration certificates did not play any role in those transactions and that the lenders or financial institutions involved never asked him to provide copies of the registration certificates for his registered Holstein cows. (Trial Tr. 119.) Similarly, Smith testified that he has never been asked by a lender or financial institution in the course of a farm loan transaction to provide copies of registration certificates for his registered Holstein cows. (Trial Tr. 120.)

19. Fessenden testified that in his role as Senior Loan Officer with FCE he is responsible for an eighty million dollar portfolio. He also stated that he is still privately involved in the dairy

industry as an investor, consultant, and mentor to a small dairy farmer who is operating a thirty-five Jersey cow farm. (Trial Tr. 137.)

20. Fessenden testified that as a lender, registration certificates are not important to him in relation to the loan application process. He is more interested in the number of dairy cattle the farmer owns, the farm's milk production output, and the quality of the herd. (Trial Tr. 141–42.) Registration certificates are not required as part of FCE's loan application process and they are not considered or viewed in the course of FCE's due diligence in connection with loan application processing, loan documentation, or periodic review of existing accounts. (Trial Tr. 142.)

21. Based on his personal and professional experience, Fessenden testified that it is not common practice in the dairy cattle industry to rely upon registration certificates to identify cows. (Trial Tr. 143.) In fact, Fessenden testified that registration certificates do not play any role in the loan application process. (Trial Tr. 142.)

22. On cross-examination, when pressed by Angell's counsel, Fessenden testified that if FCE were preparing to enforce its lien on a dairy cow or a portion of a herd, it would identify the cow or portion of the herd using the particular farm's record system, which could include registration certificates. (Trial Tr. 144.) On re-direct, however, Fessenden qualified his testimony that he does not believe it is a regular practice for a lender to utilize registration certificates in the course of lien enforcement typically because the lender's interest will be collateralized by the entire herd. (Trial Tr. 148.)

## ARGUMENTS

The Trustee contends that evidence of a trade usage or custom within the context of a particular industry must be proven by the party seeking to benefit from the same. Both the

District Court and the Trustee refer this Court to the test set forth in NY UCC § 1-205(2), which deals with trade usage as a factor in reaching the commercial meaning of an agreement between contracting parties and reads in part: "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."  N.Y. U.C.C. § 1-205(2) (Consol. 2014).  The Trustee first argues that the relevant trade must be construed broadly and, thus, in this proceeding the trade must be defined as the dairy cattle business rather than the registered Holstein dairy cattle business.  Second, the Trustee submits that the relevant commercial transaction is a commercial lending transaction rather than an auction sale transaction.  Finally, while the Trustee concedes that Angell has proven that Empire Livestock follows a procedure of matching registered cows to registration certificates in order to determine whether such cows may be sold at auction as purebred livestock, he argues that she has not proven a trade usage or industry custom of utilizing information on a registration certificate to supplement a collateral description on a UCC-1 financing statement.

Angell argues that she has proven an industry custom of reliance on registration certificates by the general public to assist in identifying a cow at auction or in any other context.  Angell suggests that the relevant transaction should be broadly interpreted to include not only a commercial lending transaction but also a private purchase and sale transaction or an auction transaction.  Angell contends that with respect to the sixteen cows at issue, a third party in the course of his due diligence would have discovered and been able to use the registration certificates to identify the cows and match them to the information listed on the 2008 UCC-1.  Angell submits that her position is supported by Sherwood's testimony that he in fact utilized the sketches on the registration certificates to identify the sixteen cows upon their arrival at the

auction barn and by the testimony of Wilson and Fessenden that registration certificates may be used to identify registered cows. Accordingly, Angell asks this Court to find that she has a perfected security interest in the sixteen cows at issue thereby defeating the Trustee's claims.

## DISCUSSION

The parties agree that in order for Angell to defeat the Trustee's challenge and overcome his claims, she must have a properly perfected security interest in the sixteen cows. Under Bankruptcy Code § 544(a), if Angell's security interest was unperfected or improperly perfected as of the date of filing, the Trustee as a hypothetical lien creditor would take priority over her security interest and could avoid any payments made thereunder within ninety days of the filing under Bankruptcy Code § 547. 11 U.S.C. §§ 544(a)(1), 547(b). Proper perfection under state law, however, would make Angell's interest enforceable over the claims of third parties, including the Trustee.

Given this framework, the Court agrees with the Trustee that, post-remand, the outcome of the present dispute turns on whether Angell has established a regularly observed practice or method in the dairy cattle industry by third party lenders or creditors of utilizing registration certificates to identify cattle subject to a prior security interest in the course of their due diligence. Based on the evidence presented at trial, the Court finds that the relevant industry is the dairy cattle industry as a whole and that the relevant transaction is a commercial or private lending transaction in which an interested third-party would seek to ascertain superior liens to the borrower's collateral.

The Court weighed the testimony of each witness equally and both the testimony and documentary evidence unquestionably support the Trustee's position that Angell has failed to prove the industry custom upon which she relies. Although it is widely acknowledged in the

dairy cattle industry that a registered cow may be more valuable than a non-registered cow due to its pedigree, Angell has not shown that dairy cattle are regularly identified for purposes of collateralization and secured lending by reference to registration certificates.

## CONCLUSION

The question of whether a UCC-1 collateral description is adequate for purposes of perfection must be answered on a case-by-case basis. *In re Bennett Funding Group, Inc.*, 1998 Bankr. LEXIS 1938, at *19 (Bankr. N.D.N.Y. May 6, 1998). Here, Angell bears the burden of proving perfection as against a third party under state law and to defeat the Trustee's claims under bankruptcy law. *Collins*, 2013 U.S. Dist. LEXIS 89524, at *8. The District Court remand makes clear that the 2008 UCC-1 is effective and reasonably identifies the collateral subject to Angell's security interest under the relevant state law only if Angell can rely upon an established industry custom or trade usage as defined above. This Court finds in light of the evidence presented that Angell cannot rely upon the same. Based on the foregoing, the Court concludes that Angell's security interest is unperfected under the facts and circumstances presented in this case and the Trustee is entitled to judgment as to both claims in this proceeding.

IT IS SO ORDERED.

Dated at Utica, New York
this 28th day of May 2014

/s/ Diane Davis_____
DIANE DAVIS
United States Bankruptcy Judge